Sheehan & Associates, P.C.
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Telephone: (516) 303-0552
Fax: (516) 234-7800
spencer@spencersheehan.com

(*Additional Counsel on Signature Page*)

United States District Court
Southern District of New York

1:19-cv-08975-PGG

| |
|---|
| Eric Parham, individually and on behalf of all others similarly situated, |
| Plaintiff, |
| - against - |
| Aldi Inc., |
| Defendant |

First Amended Class Action
Complaint

Plaintiff by attorneys allege upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.     Aldi Inc. ("defendant") manufactures, distributes, markets, labels and sells organic unsweetened vanilla almondmilk purporting to be flavored only with vanilla under the Friendly Farms brand ("Product").

2.     The Product is available to consumers from defendant's retail stores and website and is sold in cartons of 64 OZ (1.89L).

3.     The relevant front label representations include "Friendly Farms," "Vanilla," "Organic" "Unsweetened," "Almond" and "Almondmilk."



4.      The representations are misleading because although the characterizing flavor is represented as vanilla, its flavor is (1) not derived exclusively from vanilla beans, (2) has less vanilla than the label represents, (3) contains non-vanilla artificial flavors and (4) not disclosed to consumers on the front label or ingredient list as required by law and consumers' expectations.

I.      Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

5.      The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized flavor commonly known as vanilla,

6.      Vanilla's "desirable flavor attributes…make it one of the most common ingredients

used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[2]

7.     Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[3]

8.     It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[4]

9.     This demand could not be met by natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

10.     Today, headlines tell a story of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[5]

11.     Though "food fraud" has no agreed-upon definition, its typologies encompass an ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

---

[2] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.
[3] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.
[4] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein, "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.
[5] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

A. Food Fraud as Applied to Vanilla

12.    Vanilla is considered a "high-risk [for food fraud] product because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide variability of quality and value of vanilla flavorings," second only to saffron in price.[6]

13.    The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[7]

| Type of Food Fraud | Application to Vanilla |
|---|---|
| ➢ Addition of markers specifically tested for | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor<br>• Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[8] |
| ➢ Substitution and replacement of a high-quality ingredient with alternate ingredient of lower quality | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use<br>• Coumarin, a toxic phytochemical in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |

---

[6] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.
[7] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.
[8] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

➢ Addition of less expensive substitute ingredient to mimic flavor of more valuable component

- Synthetically produced ethyl vanillin, from recycled paper, tree bark or coal tar, to imitate taste of real vanilla

- "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[9]

➢ Compounding, Diluting, Extending

- Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[10]

- "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark

➢ Addition of fillers to give the impression there is more of the product than there actually is

- Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex County

- Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list

➢ Ingredient List Deception[11]

- o "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics

- o "natural vanilla flavorings" – "-ing" as suffix referring

---

[9] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.
[10] Berenstein, 423.
[11] A recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.

to something *like* that which is described

o   "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food

o   "Natural Flavors" – containing "natural vanillin" derived not from vanilla beans but from tree pulp. When paired with real vanilla, vanillin is required to be declared as an artificial flavor[12]

o   "Non-Characterizing" flavors which are not identical to vanilla, but that extend vanilla

14.   The above-described "plasticity of legal reasoning" with respect to food fraud epitomized what H. Mansfield Robinson and Cecil H. Cribb noted in 1895 in the context of Victorian England:

the most striking feature of the latter-day sophisticator of foods is his knowledge of the law and his skill in evading it. If a legal limit on strength or quality be fixed for any substance (as in the case of spirits), he carefully brings his goods right down to it, and perhaps just so little below that no magistrate would convict him.

*The law and chemistry of food and drugs*. London: F.J. Rebman at p. 320.[13]

II.   Requirements for Food Labeling to Prevent Consumer Deception

15.   Standards of identity for food were established to protect consumers from economic adulteration – the substitution of more valuable ingredients and replacement with less valuable and harmful ones. *See* 21 U.S.C. § 343(g).

16.   Where a food product is represented as one for which "a definition and standard of identity has been prescribed by regulations," it is required to "conform[s] to such definition and

---

[12] The numerous "naturally produced vanillins" are just as potent as their synthetic predecessors, such that "one ounce of vanillin is equal to a full gallon of single-fold vanilla extract."

[13] Cited in Sébastien Rioux, "Capitalist food production and the rise of legal adulteration: Regulating food standards in 19th-century Britain," Journal of Agrarian Change 19.1 (2019) at p. 65 (64-81).

standard" and "bear[s] the name of the food specified in the definition and standard," it is misleading if it deviates from this standard. *See* 21 U.S.C. §343(g).

17.    Standards of identity are described as "recipe" standards because they require standardized foods to contain specific ingredients in specific amounts.

18.    Standards of identity reflect a recognition by Congress of the inability of consumers to determine the relative merits of a variety of products superficially resembling each other based on informative labeling in places other than a product's front label, such as from an ingredient list.

19.    Standards of identity also reflect the intention of Congress to preclude manufacturers and courts from determining for themselves whether a food purporting to be or containing a standardized food was permitted to contain different ingredients or different amounts of ingredients and determine consumers could not have been misled due to a product which deviated from a standard.

20.    Standards of identity are a bulwark against consumer deception by:[14]

   1. Preventing confusion by reducing uncertainty faced by consumers making purchasing decisions and must select amongst numerous similarly labeled products;

   2. Eliminating possibility of economic adulteration of standardized foods through substitution of lower quality ingredients;

   3. Increasing the informational value of a product name, i.e., "vanilla," through restricting the range of information that can be conveyed by that product name, equivalent to a "shortcut" for typical harried grocery store purchasers;

   4. Once a food has been standardized, the product name associated with that food, i.e., "vanilla," acquires a precise and specific meaning that it did not have prior to the

---

[14] Christopher Chen, "Food and drug administration food standards of identity: Consumer protection through the regulation of product information." Food & Drug LJ 47 (1992): 185.

creation of the standard.

21.     New York State has adopted and incorporated in its entirety, all provisions of the

Federal Food, Drug and Cosmetic Act ("FFDCA") through its Agriculture and Markets Law

("AGM") and the accompanying regulations. *See* Title 1, Department of Agricutlure and Markets,

Official Compilation of Codes, Rules and Regulations of the State of New York ("NYCRR").

22.     Vanilla products are the only flavorings subject to standards of identity.  *See* 21

C.F.R. Part 169 ("Food dressings and flavorings"); 21 C.F.R. §169.3 ("Definitions"); 21 C.F.R. §

169.175 – 21 C.F.R. § 169.182 (vanilla products); *see also* 1 NYCRR § 250.1(a)(17) ("the

commissioner hereby adopts the following as the standards of identity and/or standards of quality,

and tolerances for food and food products as published in title 21 of the Code of Federal

Regulations…21 CFR part 169, containing the Federal definitions and standards for *Food*

*Dressings and Flavorings* at pages 600-606.") (italics in original).[15]

23.     Prior to adoption of vanilla standards under the Federal Food Drugs & Cosmetic Act

("FFDCA") during the era of the "Pure Food Laws," "the widespread and exceedingly serious

adulteration of vanilla extracts that are now labeled 'pure'…deprive[d] the consumer of value the

product is represented to have, and for which the consumer pays.[16]

24.     These practices were chronicled in Notices of Judgment issued by the Department of

Agriculture against manufacturers who passed off imitation vanilla products:

---

[15] 1 NYCRR § 250.1(a)(17), Section 250.1, Foods, Part 250, Definitions and Standards, Subchapter C, Food and Food Products, Chapter VI, Food Control, Title 1.
[16] Letter from McCormick & Company Inc. to HEW Secretary, January 15, 1960; Memorandum of Telephone Conversation between Mr. Alfred Daibock, Commercial Policy Division, Department of State and Tom Bellis, Food Standards Branch, FDA (the FDA stated, "The prime purpose sought to be served by the standards adopted was to promote honest, fair dealing with housewives and other consumers of the flavorings covered by the standards").

Misbranding was alleged for the further reason that the product was labeled and branded so as to deceive and mislead the purchaser thereof, in that said label was calculated and intended to create the impression and belief in the mind of the purchaser that the product was a genuine vanilla extract, whereas, in fact, it was a mixture of vanilla extract, vanillin, and coumarin, artificially colored with caramel.

Notice of Judgment No. 2241, Adulteration and Misbranding of…Vanilla Extract, United States Department of Agriculture, W. M. Hays, Acting Secretary, Washington, D.C., January 23, 1913.

25. The vanilla standards were intended to "insure, for the protection of both the consumers and our industry, that all vanilla products are correctly labeled and meet at least minimum standards."[17]

26. The objective basis for the standards is the requirement that a "*unit of vanilla constituent* means the total sapid and odorous principles extractable from one unit weight of vanilla beans," or 13.35 ounces.[18]

27. Federal regulations require that a food which is not subject to a standard of identity is required to bear a "common or usual name of a food" which "accurately identif[ies] or describe[s], in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients." *See* 21 C.F.R. § 102.5(a).

28. The "common or usual name" requirement is incorporated in its entirety and without modification through the regulations accompanying N.Y. AGM Article 17:

the commissioner hereby adopts the current regulations as they appear in title 21 of the Code of Federal Regulations (revised as of April 1, 2013; U.S. Government Printing Office, Washington, DC 20402), in the area of food packaging and labeling as follows…(4) Part 102 of title 21 of the *Code of Federal Regulations*, containing the Federal definitions and standards for Common or Usual Name for Nonstandardized Foods at pages 173-180.

1 NYCRR § 259.1(a)(4), Section 259.1, Packaging and labeling of food, Part 259, Packaging and labeling of food, Subchapter C, Food and Food Products, Chapter

---

[17] Letter from McCormick & Company Inc. to HEW Secretary, January 15, 1960; Press Release U.S. Department of Health, Education, and Welfare, September 13, 1963.
[18] 21 C.F.R. §169.3(c) referencing 21 C.F.R. §169.3(b).

VI, Food Control, Title 1.

29.    If a product makes a representation as to its primary flavor, the common or usual name is required to designate the source and amount of flavor in a specific way so that consumers will not be misled:

> If the label, labeling, or advertising of a food makes any direct or indirect representations with respect to the primary recognizable flavor(s), by word, vignette, e.g., depiction of a fruit, or other means, or if for any other reason the manufacturer or distributor of a food wishes to designate the type of flavor in the food other than through the statement of ingredients, such flavor shall be considered the characterizing flavor…

21  C.F.R. § 101.22(i)(1).

30.    These regulations have been adopted in their entirety and without modification by New York State, through the regulations accompanying N.Y. AGM Article 17:

> the commissioner hereby adopts the current regulations as they appear in title 21 of the Code of Federal Regulations (revised as of April 1, 2013; U.S. Government Printing Office, Washington, DC 20402), in the area of food packaging and labeling as follows…(3) Part 101 of title 21 of the Code of Federal Regulations, containing the Federal definitions and standards for Food Labeling (including Appendices) at pages 10-172.

> 1 NYCRR 259.1(a)(3) contained in Section 259.1 ("Packaging and labeling of food.")

31.    The result is that New York State labeling requirements for an organic unsweetened vanilla almondmilk are identical to those established by the FDA.

32.    If the labeling of organic unsweetened vanilla almondmilk is inconsistent with the federal standards, then it also violates what New York requires.

III.    Shortage of Vanilla Leads to Cut Corners and Consumer Deception

33.    For decades, The Flavor and Extract Manufacturers Association ("FEMA") successfully protected consumers from misleading and fraudulent vanilla labeling through a system of "self-policing" where companies were held accountable to industry standards which

10

followed federal regulations.

34.     However, FEMA was strong-armed into abandoning these efforts and disbanding its Vanilla Committee due to alleged financial pressure from its largest members.

35.     Into this gap, flavor and food companies quickly reverted to practices which had been eradicated with the promulgation of the vanilla standards in the early 1960s.

36.     The flavor industry benefits from high vanilla prices and the use of less real vanilla.

37.     Because vanilla extract and vanilla flavoring are standardized foods, there is little opportunity for "innovation" – the ingredients, ratios, and processes are fixed, keeping profit margins consistent and relatively low.

38.     The recent global shortage of vanilla beans has provided the flavor industry another opportunity to "innovate[ing] natural vanilla solutions…to protect our existing customers."[22]

39.     When less vanilla is available, flavor companies can sell higher margin, proprietary, "vanilla-like" flavorings made with advanced chemistry and synthetic biology.

40.     According to Suzanne Johnson, vice president of research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price," known as "Vanilla WONF."

41.     The head of "taste solutions" at Irish conglomerate Kerry plc, urged flavor manufacturers to "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

42.     A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of vanilla beans. The result is a greater consistency in pricing, availability and quality."[23]

---

[22] Amanda Del Buono, Ingredient Spotlight, Beverage Industry, Oct. 3, 2016.
[23] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.

43.     These compounded flavors exist in a "black box" with "as many as 100 or more flavor ingredients," including "naturally produced vanillin," potentiators and enhancers, like maltol and piperonal, blended together to enhance the vanilla, allowing the use of less vanilla to achieve the intended taste.[24]

IV.     "Vanilla" Without Qualification Tells Consumers All of Product's Flavor and Vanilla Taste is from Vanilla Beans

44.     Since vanilla is subject to a standard of identity, the Product's front label designation of "vanilla" gives consumers the impression it contains an exclusively vanilla standardized ingredient. *See* 21 U.S.C. §343(g).

45.     Consumers expect a food with a flavor designated as "vanilla" to contain only flavoring from vanilla beans because consumers are accustomed to purchasing and using standardized vanilla foods, mainly in the form of vanilla extract. *See* 21 C.F.R. § 101.22(i)(1) (describing a characterizing flavor which contains no simulating artificial flavor and not subject to 21 C.F.R. § 101.22(i)(1)(i)-(iii)); *see also* 21 C.F.R. § 169.175 ("Vanilla extract").

46.     Consumers expect this because they are accustomed to seeing labels with terms such as "flavored," "artificial flavors" and "with other natural flavors." *See* 21 C.F.R. § 101.22(i)(1)(i) ("e.g., 'natural strawberry flavored shortcake,' or 'strawberry flavored shortcake'."); 21 C.F.R. § 101.22(i)(1)(ii) and 21 C.F.R. § 101.22(i)(2) ("artificially flavored"); 21 C.F.R. § 101.22(i)(1)(iii) ("with other natural flavor").

47.     However, the actual flavor ingredients in the Product do not "conform[s] to such definition and standard" of vanilla and "its label [fails to] bear[s] the name of the food specified in

---

[24] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).

the definition and standard. *See* 21 U.S.C. §343(g); *see also* 21 C.F.R. § 169.175 (a) (defining vanilla extract as "the solution in aqueous ethyl alcohol of the sapid and odorous principles extractable from vanilla beans," with not less than 35 percent ethyl alcohol and a "content of vanilla constituent, as defined in 169.3(c), [is] not less than one unit per gallon"); 21 C.F.R. § 169.177 (a) (defining "vanilla flavoring" as identical to "vanilla extract" "except that its content of ethyl alcohol is less than 35 percent by volume").

V.   Product Contains Undisclosed Non-Vanilla Flavors Which Misleads Consumers

A.   Ingredient List Reveals Non-Vanilla Flavors

48.   The presence of non-vanilla flavors is evident from the ingredient list which designates "Natural Flavor" as the only flavoring ingredient.

**INGREDIENTS:** FILTERED WATER, ORGANIC ALMONDS, ORGANIC-CERTIFIED NATURAL FLAVOR, SEA SALT, GELLAN GUM, XANTHAN GUM, ORGANIC SUNFLOWER LECITHIN.

**INGREDIENTS:**   FILTERED   WATER,   ORGANIC ALMONDS, ORGANIC-CERTIFIED NATURAL FLAVOR, SEA SALT, GELLAN GUM, XANTHAN GUM, ORGANIC SUNFLOWER LECITHIN.

49.   That "Natural flavor" does not refer to an exclusively vanilla ingredient is discerned through careful reading of the regulations. *See* 21 C.F.R. § 101.4(a)(1) ("designation of ingredients").

50.   Because all ingredients are required to be "listed by common or usual name," and the names for the exclusively vanilla standardized foods are "vanilla extract" and "vanilla flavoring," the Product admittedly does not contain such ingredients as the sole source of flavoring. *See* 21 C.F.R. § 169.175(b)(1) ("The specified name of the food is 'Vanilla extract' or 'Extract of

vanilla'.") and 21 C.F.R. § 169.177(b) ("The specified name of the food is 'Vanilla flavoring.'");

*see also* 21 C.F.R. § 101.4(b)(1) (the "name of an ingredient shall be a specific name and not a

collective (generic) name," subject to various exceptions).

51.    The distinction between vanilla and non-vanilla flavorings is recognized in 21 U.S.C.

§ 343.  *See* 21 U.S.C. § 343(g) (applies to foods which purport to be a standardized food, which

include the vanilla products) *but see* 21 U.S.C. § 343(i) (applies to foods which have "no

representation as to definition and standard of identity," and stating that "spices, flavorings, and

colors…may be designated as spices, flavorings, and colorings without naming each.").

52.     "Natural flavor" is the term used for a flavor that may contain some vanilla and

non-vanilla natural flavors. *See* 21 C.F.R. § 101.22(h)(1) ("Spice, natural flavor, and artificial

flavor may be declared as 'spice', 'natural flavor', or 'artificial flavor', or any combination thereof,

as the case may be.").

53.    21 U.S.C. § 343(g) and 21 U.S.C. § 343(i) make clear that 21 C.F.R. § 101.22(h)(1)

is not applicable where the ingredients added are the standardized vanilla foods.

54.    It would make no sense for vanilla, when added separately, to be allowed to be listed

as "natural flavor" because this interpretation would cause conflict between the two sections, and

it must be presumed Congress was aware of this issue.

55.    To accept an argument that exclusively vanilla ingredients could be labeled as

"natural flavor" would mean the vanilla standards are not relevant and that a manufacturer could

"choose" which terms to use on their ingredient list.

B.  GC-MS Analysis Reveals *de minimis* Amount of Vanilla but High Levels of Artificial Vanilla Flavoring

56.    The application of gas chromatography-mass spectrometry ("GC-MS") can identify

small and volatile compounds, such as aromatics, benzenes and alcohols, which are present in

vanilla and other flavors.

57.   Though GC-MS can identify more than 150 compounds which comprise vanilla, the "main vanilla flavor backbone of commercial vanilla species is constituted by the so called marker compounds, identified in the table below.[25]

58.   However, the "main vanilla flavor backbone of commercial vanilla species is constituted by the so called marker compounds: vanillin, *p*-hydroxybenzaldehyde, vanillic acid, and *p*-hydroxybenzoic acid" with their ratios – identified in the below table

| Compounds | Percent Present in Vanilla Beans |
|---|---|
| vanillin | 1.3-1.7 % |
| p-hydroxybenzaldehyde | 0.1% |
| vanillic acid | 0.05% |
| p-hydroxybenzoic acid | 0.03% |

59.   The presence and amount of these compounds are "used as an indicator of quality of commercial vanilla to detect adulteration of beans and extracts."[26]

60.   In analyzing defendant's organic unsweetened vanilla almondmilk, the sample was purged with inert gas, causing the volatile aromatic compounds to be extracted.

61.   These compounds were then run through the capillary columns and eluted at different times before reaching the mass spectrometer.

62.   The mass spectrum plots the compounds' elution time on the X-axis and the amount or intensity of the compounds on the Y-axis.  Exhibit "A," GC-MS Report, April 21, 2020.

---

[25] ThermoFisher Scientific, Gas Chromatography Mass Spectrometry (GC/MS) Information; Arun K. Sinha et al. "A comprehensive review on vanilla flavor: extraction, isolation and quantification of vanillin and others constituents," International Journal of Food Sciences and Nutrition 59.4 (2008): 308; 299-326.

[26] Maria del Pilar Galeas, "Gas chromatography-mass spectrometry and gas chromatography-olfactometry analysis of aroma compounds of vanilla pompona schiede," Diss. Rutgers University-Graduate School-New Brunswick, 2015 citing A.S. Ranadive, Vanilla-cultivation, curing, chemistry, technology and commercial product. In: Spices Herbs and Edible Fungi. Charalambous, G. (Ed), Developments in Food Science, Vol. 34, Elsevier Science Publishers BV, Amsterdam, The Netherlands, pp 517-577 (1994).

## Chromatogram



63.     The peak assignment table identifies the compounds in column three (peak assignment) by matching their mass-to-charge (m/z) ratio with mass spectral libraries of all known compounds.

64.     Columns two (Area Integration) and four (concentration parts per million or "Conc. PPM w/w.") shows the relative amounts of the detected compounds.

## Peak Assignment Table

### Table 1

Sheehan & Associates, P.C., Project #7649
Friendly Farms Unsweetened Vanilla Almond Milk
Production Code: 011868 C
Methylene Chloride Extract of 10.0 g with 1 ppm Matrix-Spiked Int. Std. by P&T-TD-GC-MS

Data File = TSQA4015

| MS Scan # | Area Integration | Peak Assignment | Conc. PPM w/w |
|---|---|---|---|
| 111 | 371683 | acetic acid | 0.033 |
| 144 | 29804 | 1-butanol | 0.003 |
| 186 | 444550 | acetol | 0.039 |
| 208 | 109714 | propionic acid | 0.010 |
| 227 | 7448 | methyl butyrate | 0.001 |
| 238 | 32029 | acetoin | 0.003 |
| 270 | 33249 | 1,2-propylene glycol | 0.003 |
| 309 | 68820 | butyric acid | 0.006 |
| 338 | 59233 | hexanal | 0.005 |
| 360 | 26350 | ethyl lactate | 0.002 |
| 377 | 46160 | methyl pyrazine | 0.004 |
| 383 | 229750 | furfural | 0.020 |
| 410 | 4687516 | furfuryl alcohol | 0.415 |
| 424 | 32018 | pentanoic acid | 0.003 |
| 469 | 7302 | heptanal | 0.001 |
| 484 | 34422 | 2-acetyl furan | 0.003 |
| 488 | 149331 | gamma-butyrolactone | 0.013 |
| 491 | 170692 | 2,5-dimethylpyrazine | 0.015 |
| 498 | 20729 | 2,3-dimethylpyrazine | 0.002 |
| 539 | 479577 | hexanoic acid | 0.043 |
| 556 | 221652 | benzaldehyde | 0.020 |
| 567 | 5946 | 6-methyl-5-hepten-2-one | 0.001 |
| 576 | 9878 | 2-pentylfuran | 0.001 |
| 585 | 40804 | octanal | 0.004 |
| 590 | 24815 | 2-ethyl-6-methylpyrazine | 0.002 |
| 597 | 79209 | trimethylpyrazine | 0.007 |
| 603 | 30419 | 1H-pyrrole-2-carboxaldehyde | 0.003 |
| 623 | 321116 | cyclotene | 0.028 |
| 634 | 176463 | benzyl alcohol | 0.016 |
| 651 | 160203 | furaneol | 0.014 |
| 657 | 128873 | heptanoic acid | 0.011 |
| 663 | 119894 | 2-acetyl pyrrole | 0.011 |
| 673 | 65297 | 3-ethyl-2,5-dimethylpyrazine + gamma-hexalactone | 0.006 |
| 690 | 11634 | methyl furoate | 0.001 |
| 693 | 453655 | guaiacol | 0.040 |
| 702 | 90474 | nonanal | 0.008 |
| 725 | 58411038 | maltol | 5.177 |
| 760 | 283410 | octanoic acid | 0.025 |
| 763 | 305833 | benzoic acid | 0.027 |
| 803 | 292075 | 2-methoxy-4-methylphenol | 0.026 |
| 808 | 214385 | decanal | 0.019 |
| 820 | 11283220 | naphthalene-d8 (internal standard) | 1.000 |
| 837 | 48774 | hydroxy methyl furfural (HMF) | 0.004 |
| 853 | 325282 | nonanoic acid | 0.029 |
| 866 | 24444 | trans-2-undecenal | 0.002 |
| 877 | 1917081 | 4-methoxybenzaldehyde (p-anisaldehyde) | 0.170 |
| 886 | 14311 | benzeneacetaldehyde, alpha-ethylidene | 0.001 |
| 899 | 262917 | 2,4-decadienal | 0.023 |
| 919 | 13267 | glyceryl triacetate (Triacetin) | 0.001 |
| 923 | 442736 | 2,4-decadienal | 0.039 |
| 932 | 48134 | possibly cyclotene, 1,2-propylene glycol cyclic ketal (syn) | 0.004 |
| 939 | 28107 | possibly cyclotene, 1,2-propylene glycol cyclic ketal (anti) | 0.002 |
| 945 | 148836 | decanoic acid | 0.013 |
| 964 | 173221 | 3- or 4-hydroxybenzeneacetic acid | 0.015 |
| 970 | 136615 | 3-hydroxybenzaldehyde | 0.012 |
| 1009 | 90444975 | vanillin | 8.016 |
| 1036 | 8984 | geranyl acetone | 0.001 |
| 1054 | 135962 | vanillyl ethyl ether | 0.012 |
| 1084 | 8888 | acetovanillone | 0.001 |
| 1107 | 21057 | vanillyl acetate | 0.002 |
| 1116 | 28357 | lauric acid + vanillyl methyl ketone | 0.003 |
| 1237 | 180282 | a thiamine type vitamin | 0.016 |
| 1472 | 289341 | vanillin, glyceryl cyclic acetal (syn) | 0.026 |
| 1504 | 197116 | vanillin, glyceryl cyclic acetal (anti) | 0.017 |
| 1571 | 202307 | vanillin, glyceryl cyclic acetal (isomer) | 0.018 |
| | | **Total (excluding internal standard)** | **14.498** |

65.    Defendant's organic unsweetened vanilla almondmilk reveals vanillin (MS Scan #

1009, 8.016 PPM) yet fails to reveal *any* of the other marker compounds for vanilla – p-hydroxybenzaldehyde, p-hydroxybenzoic acid or vanillic acid.

66.    The GC-MS analysis reveals the adulteration of vanilla through "an abnormal excess of vanillin [8.016 PPM] relative to the profile of minor components in a vanilla preparation [not detected]."[27]

67.    The logical explanation for the absence of the three marker compounds despite the comparatively high level of vanillin is not because the Product lacks any vanilla,[28] but that it contains a trace or *de minimis* amount such that these polar aromatic compounds are not detectable by advanced scientific means.

68.    The Product also contains maltol (MS Scan # 725, 5.177 PPM), an (artificial) synthetic flavor enhancer. *See* 21 C.F.R. § 172.515(b) ("Synthetic flavoring substances and adjuvants.").[29]

69.    Maltol fills the role of coumarin, which was used to boost the vanilla taste of a food which contained minimal or no real vanilla, before it was banned for toxicity.[30]

70.    Though maltol does not contribute a flavor of its own, it modifies and enhances the "inherent flavors of the foods to which they are added."[31]

71.    Though maltol has been detected in vanilla, it will be present at levels no greater than one percent of the amount detected here, which means it was added to the "Natural Flavor."

---

[27] Sinha at 319-20 ("Adulteration can be detected chromatographically by an abnormal excess of vanillin relative to the profile of minor components in a vanilla preparation, but again the possibility is there to manipulate this profile artificially.").
[28] The analysis reveals 4-methoxybenzaldehyde or p-Anisaldehyde (MS Scan # 877, 0.170 PPM), a compound found in Tahitian vanilla.
[29] 21 C.F.R. § 172.515(b) ("Synthetic flavoring substances and adjuvants.").
[30] *Id.*
[31] Darren T. LeBlanc and Hugh A. Akers, "Maltol and ethyl maltol: from larch tree to successful food additives," Food Technol. 26 (1989): 78-87.

VI.
VI.      Front Label and Ingredient List Fail to Disclose Non-Vanilla and Artificial Flavors

72.      The Product's "Natural Flavor" appears to be an ingredient designated in the trade as "Vanilla With Other Natural Flavor" or "Vanilla WONF."

73.      Vanilla WONF refers to an ingredient that contains *some* vanilla and "other natural flavors" from non-vanilla sources which enhance and resemble vanilla.

74.      Assuming the Product contains a trace of vanilla extract, the presence of non-vanilla vanillin and maltol *appears* to trigger the WONF flavor declaration, because these ingredients resemble and enhance vanilla. *See* 21 C.F.R. § 101.22(i)(1)(iii) ("If the food contains both a characterizing flavor from the product whose flavor is simulated [vanilla] and other natural flavor [naturally derived vanillin and natural maltol] which simulates, resembles or reinforces the characterizing flavor, the food shall be labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section and the name of the food shall be immediately followed by the words 'with other natural flavor'").

A.   The Product is not Subject to the WONF Flavor Designation

75.      Vanilla's standards of identity mean that where a product's primary characterizing flavor is vanilla, the vanilla regulations take precedence over the general flavor regulations and the "WONF" labeling structure. *Compare* 21 C.F.R. § 101.22 with 21 C.F.R. § 169.175-21 C.F.R. § 169.182 (vanilla products).

76.      These standards prohibit the addition of non-vanilla natural flavors and allow adding only glycerin, propylene glycol, sugar, dextrose, corn syrup or vanillin.  *See* 21 C.F.R. § 169.175(a)(1)-(5) (ingredients permitted for addition to vanilla extract); *see also* 21 C.F.R. § 169.180(a) (permitting "not more than 1 ounce of added vanillin" for "each unit of vanilla constituent, as defined in 169.3(c)" in the combination labeled "Vanilla-vanillin extract."); *see also* 21 C.F.R. § 169.181 (Vanilla-vanillin flavoring), 21 C.F.R. § 169.182 (Vanilla-vanillin

powder).

77.    The reason the vanilla standards do not provide for the addition of "other natural flavors" is because they were developed to *prevent* spiking a "trace" of vanilla with non-vanilla flavors which imitated vanilla but were cheaper and lower quality than vanilla, such as maltol and "natural vanillin," from sources other than vanilla beans.

78.    Moreover, a front label flavor designation of "Vanilla With Other Natural Flavors" would not disclose to consumers how much of the Product's vanilla taste is from vanilla vis-à-vis non-vanilla flavors and enhancers.  Exhibit B, FDA, Letter, Taylor Quinn to Ernie Molina, January 17, 1980 ("the general principles of 21 CFR 102.5 should apply" and proportions of each component should be disclosed, i.e., "contains 50% vanilla extract and 50% non-vanilla flavors" or otherwise disclose the proportions.).

79.    According to representatives of FEMA:

The standards for vanilla extract and the other standardized vanilla products at 21 CFR 169 expressly do not provide WONF designation. This means that a flavoring mixture of vanilla extract and vanillin produced through a "natural" process (i.e. a process consistent with the definition of natural flavor at 21 CFR Section 101.22(a) (3)) cannot be described as "vanilla extract WONF," "vanilla WONF" or other similar descriptive terms.

Exhibit C, John B. Hallagan and Joanna Drake, The Flavor and Extract Manufacturers Association of the United States, "Labeling Vanilla Flavorings and Vanilla-Flavored Foods in the U.S.," Perfumer & Flavorist, Vol. 43 at p. 46, Apr. 25, 2018.

80.    The designation of the added vanillin as "natural flavor" in the organic unsweetened vanilla almondmilk Product is misleading because, when read with the unqualified front label of "vanilla," it implies that "it is a 'natural vanilla flavor'" even though it is not derived from vanilla beans.  Exhibit D, FDA, Letter, Negash Belay to Agneta Weisz, October 10, 2008 ("with respect to labeling, the common or usual name of the product you describe is 'vanillin,' regardless of the type of method used to produce it."); Exhibit E, FDA, Letter, Manjeet Singh to Anthony Filandro,

July 9, 1991 (naturally produced "vanillin would not qualify as 'natural vanillin,' as defined in 21 CFR 101.22(a)(3), because the vanillin is not obtained from vanilla beans, whose flavor it simulates."); Exhibit F, FDA, Letter, Margaret-Hanna Emerick to Richard Brownell, February 25, 2016 ("natural flavor" must not be used in such a way to imply that it is a "natural vanilla flavor" because it is not derived from vanilla beans").

81.   Though a naturally derived vanillin may be designated "'natural flavor'" in the context of the general flavor regulations at 21 C.F.R. § 101.22, this is outside the context of the standardized vanilla ingredients "under sections 169.180, 169.181, and 169.182 in 21 CFR." Exhibit G, FDA, Letter, Cataline Ferré-Hockensmith, August 5, 2008, p. 2; Exhibit H, FDA, Letter, Cataline Ferré-Hockensmith to Betsy D. Carlton, October 8, 2004 (the common or usual name of vanillin derived through a natural fermentation process is "vanillin" though it may be identified as "'vanillin derived naturally through fermentation' elsewhere on your product label.").

82.   Because "Vanilla extract (21 CFR 169.175) and vanilla flavoring (21 CFR 169.177) do not provide for the use of vanillin," it is deceptive to give consumers the impression a product containing added vanillin contains "natural vanilla flavors." Exhibit I, FDA Letter, Cataline Ferré-Hockensmith to Richard Brownell, April 19, 2005, pp. 1-2; *see* 21 C.F.R. § 169.175(a)(1)-(5) (listing glycerin, propylene glycol, sugar, dextrose and corn sirup as only optional ingredients for vanilla extract).

83.   Because the Product contains vanilla *and* vanillin, its ingredient list is required to state "contains vanillin, an artificial flavor (or flavoring)" with the front label informing consumers it is "artificially flavored." *See* Vanilla-vanillin extract at 21 C.F.R. § 169.180(b) ("The specified name of the food is 'Vanilla-vanillin extract _-fold' or '_-fold vanilla-vanillin extract', followed immediately by the statement 'contains vanillin, an artificial flavor (or flavoring)'.").

84.     Defendant cannot claim to be exempt from the requirement for disclosing added vanillin as an artificial flavor merely because (1) the vanillin used was derived through a natural process and from a natural source, (2) it did not use the standardized flavoring ingredient of "Vanilla-vanillin extract" and (3) it added non-vanillin natural flavors to such vanilla-vanillin combination.

85.     A reasonable consumer cannot follow up or learn the truth that the Product contains non-vanillin artificial vanillin and maltol from reading the Product's ingredient list because defendant labels this incorrectly and deceptively as "Natural Flavor."

[NEXT PAGE]

VII. Products are Misleading Because They are Labeled and Named Similar to Other Products

86.    The following is an example of the product of defendant and competitor.

Competitor Product                        Defendant's Product

          

**Ingredients**:    Organic    Almond    Base
(Filtered Water, Organic Almonds), Organic
Vanilla Flavor, Sea Salt, Sunflower Lecithin,
Organic Locust Bean Gum, Gellan Gum,
Vitamin    A    Palmitate,    Ergocalciferol
(Vitamin D2), Dl-Alpha-Tocopheryl Acetate
(Vitamin E), Riboflavin (Vitamin B2), Zinc
Gluconate, Cyanocobalamin (Vitamin B12).

**Ingredients:** Filtered Water, Organic Almonds,
Organic-Certified Natural Flavor, Sea Salt,
Gellan Gum, Xanthan Gum, Organic Sunflower
Lecithin.

23

87.     The competitor product lists "Organic Vanilla Flavor" on its ingredient list and does not indicate the presence of other flavors not derived from vanilla, as defendant's Product does through the designation of "Natural Flavor."

88.     Products are required to be identified and labeled in a way consistent with other products of similar composition. *See* 21 C.F.R. § 102.5(a) ("General principles.") ("The name shall be uniform among all identical or similar products and may not be confusingly similar to the name of any other food that is not reasonably encompassed within the same name. Each class or subclass of food shall be given its own common or usual name that states, in clear terms, what it is in a way that distinguishes it from different foods.").

89.     This framework assures consumers will not be misled by the quality and components of similarly labeled products where one product contains a greater amount, type and/or proportion of a characterizing and valuable ingredient.

90.     Where two products are identified by the same descriptive terms and noun such as "organic unsweetened vanilla almondmilk" and where the front label has no other modifications of these terms, consumers will be deceived into purchasing the lower quality product under the false impression that it contains the equivalent amount of said ingredients or components.

91.     The competitor product and defendant's Product are sold in close proximity to each other and their identical names misleads consumers and plaintiff to expect that both products are identical in quality when the competitor product is of higher quality.

92.     Defendant's branding and packaging of the Product is designed to – and does – deceive, mislead, and defraud plaintiff and consumers.

93.     Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers like

plaintiff.

94.    The value of the Product that plaintiff purchased and consumed was materially less than its value as represented by defendant.

95.    Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for them.

96.    As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $2.99 for cartons of 64 OZ (1.89L), excluding tax, compared to other similar products represented in a non-misleading way.

VIII.    Conclusion

97.    Defendant's branding and packaging of the Product is designed to – and does – deceive, mislead, and defraud plaintiff and consumers.

98.    Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers like plaintiff.

99.    The value of the Product that plaintiff purchased and consumed was materially less than their value as represented by defendant.

100.   Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for them.

101.   As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $2.99 for cartons of 64 OZ (1.89L), excluding tax, compared to other similar products represented in a non-misleading way.

## Jurisdiction and Venue

102.   Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

103.   Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

104.   Plaintiff Eric Parham is a citizen of New York.

105.   Defendant Aldi Inc. is an Illinois corporation with a principal place of business in Batavia, Kane County, Illinois and therefore is a citizen of Illinois.

106.   "Minimal diversity" exists because plaintiff and defendant are citizens of different states.

107.   Venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claim occurred, *viz*, the purchase of the Product and the misleading representations relied upon by plaintiff.

108.   This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

## Parties

109.   Plaintiff Eric Parham is a citizen of Bronx, Bronx County, New York.

110.   Defendant Aldi Inc. is a Illinois corporation with a principal place of business in Batavia, Illinois, Kane County.

111.   Defendant operates more than 1,900 grocery stores across 36 states.

112.   During the relevant statutes of limitations, plaintiff purchased the Product within his district and/or State for personal consumption and/or use in reliance on the representations the

Product's flavor contained only vanilla flavoring from vanilla beans and was not enhanced by non-vanilla flavors including artificial flavors.

113.   Plaintiff Eric Parham purchased the Friendly Farms organic unsweetened vanilla almondmilk at defendant's store(s) including the location at 3006 3rd Ave, Bronx, NY 10455, near the 3rd Ave – 149th St Subway Station, and his most recent purchase occurred in September 2019.

114.   Plaintiff bought the Product because he liked the product type for its intended use and expected its vanilla flavor to not be enhanced by artificial flavors, because the front label did not disclose this nor was it clarified by the ingredient list.

115.   Plaintiff would buy the Product again if assured it did not contain vanilla-enhancing ingredients in addition to vanilla and if it was labeled in a non-deceptive manner.

<u>Class Allegations</u>

116.   The class will consist of all purchasers of the Product who reside in New York during the applicable statutes of limitations.

117.   Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

118.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

119.   Plaintiff is an adequate representatives because his interests do not conflict with other members.

120.   No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

121.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

122.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

123.  Plaintiff seeks class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL"), §§ 349 & 350
(Consumer Protection Statutes)

124.  Plaintiff incorporates by reference all preceding paragraphs.

125.  Plaintiff and class members desired to purchase and consume products which were as described and marketed by defendant and expected by reasonable consumers, given the product type.

126.  Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

127.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Product.

128.  The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect that non-vanilla, artificial flavors where a product is labeled "vanilla" without more.

129.  The ingredient list declaration of "natural flavor" fails to tell consumers and plaintiff that a trace amount of vanilla is present and what they taste as vanilla is actually from artificial flavors.

130.  Plaintiff relied on the statements, omissions and representations of defendant, and defendant knew or should have known the falsity of same.

131.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

132.  Plaintiff incorporates by reference all preceding paragraphs.

133.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Product.

134.  The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect that non-vanilla, artificial flavors where a product is labeled "vanilla" without more.

135.  The ingredient list declaration of "natural flavor" fails to tell consumers and plaintiff that a trace amount of vanilla is present and what they taste as vanilla is actually from artificial flavors.

136.  Defendant had a duty to disclose and/or provide non-deceptive marketing of the Product and knew or should have known same were false or misleading.

137.  This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product type.

138.  The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, a well-known and respected brand or entity in this sector.

139.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Product.

140.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

141.   Plaintiff incorporates by reference all preceding paragraphs.

142.   The Product were manufactured, labeled and sold by defendant and warranted to plaintiff and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not.

143.   The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect that non-vanilla, artificial flavors where a product is labeled "vanilla" without more.

144.   The ingredient list declaration of "natural flavor" fails to tell consumers and plaintiff that a trace amount of vanilla is present and what they taste as vanilla is actually from artificial flavors.

145.   Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

146.   This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

147.   Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

148.   Defendant received notice and should have been aware of these misrepresentations due to numerous complaints by consumers to its main office over the past several years regarding the Product, of the type described here.

149.   The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable.

150.   Plaintiff and class members would not have purchased the Product or paid as much

if the true facts had been known, suffering damages.

<u>Fraud</u>

151.   Plaintiff incorporates by reference all preceding paragraphs.

152.   The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect that non-vanilla, artificial flavors where a product is labeled "vanilla" without more.

153.   The ingredient list declaration of "natural flavor" fails to tell consumers and plaintiff that a trace amount of vanilla is present and what they taste as vanilla is actually from artificial flavors.

154.   Defendant's fraudulent intent is evinced by its failure to accurately identify the Product on the front label and ingredient list, when it knew its statements were neither true nor accurate and misled consumers.

155.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Unjust Enrichment</u>

156.   Plaintiff incorporates by reference all preceding paragraphs.

157.   Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying plaintiff as representative and the

undersigned as counsel for the class;

2.   Entering preliminary and permanent injunctive relief by directing defendant to correct the
     challenged practices to comply with the law;

3.   Injunctive relief to remove, correct and/or refrain from the challenged practices and
     representations, and restitution and disgorgement for members of the class pursuant to the
     applicable laws;

4.   Awarding monetary damages and interest pursuant to the common law and other statutory
     claims;

5.   Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and
     experts; and

6.   Other and further relief as the Court deems just and proper.

Dated:   June 8, 2020

Respectfully submitted,

Sheehan & Associates, P.C.
 /s/Spencer Sheehan
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Tel: (516) 303-0552
Fax: (516) 234-7800
spencer@spencersheehan.com
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
mreese@reesellp.com

1:19-cv-08975-PGG
United States District Court
Southern District of New York

Eric Parham, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Aldi Inc.,

Defendant

## First Amended Class Action Complaint

```
Sheehan & Associates, P.C.
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
   Tel: (516) 303-0552
   Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  June 8, 2020

/s/ Spencer Sheehan
Spencer Sheehan
